921 P.2d 643

**STATE of Arizona, Appellee,**

v.

**Toribio RODRIGUEZ, Appellant.**

No. CR–94–0029–AP.

Supreme Court of Arizona,
En Banc.

July 2, 1996.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Linda L. Knowles, Assistant Attorney General, Phoenix, for Appellee.

Bruner & Bowman, P.C. by Sean H. Bruner, Tucson, for Appellant.

## OPINION

MOELLER, Justice.

Defendant Toribio Rodriguez was charged with and convicted of first degree murder, two counts of sexual assault, and burglary.

He was sentenced to death on the murder count, 21 years each on the sexual assaults, and 10.5 years on the burglary. The case is before this court on direct, automatic appeal. *See* Ariz. R.Crim. P. 31.2(b); Ariz.Rev.Stat. Ann. (A.R.S.) §§ 13–4031, 13–4035 (1989).

## FACTS AND PROCEDURAL HISTORY

Dawn Dearing, the victim, lived alone in an apartment complex in Tucson. On August 24, 1988, Dearing and a co-worker shared drinks at Dearing's apartment. By the time the co-worker left, Dearing was severely intoxicated or "passed out."[1] The next afternoon, a friend of Dearing's knocked on her door but heard no answer. The friend returned several more times that night and left notes for Dearing.

On August 26, Dearing's friend returned to the apartment, discovered the door unlocked, and opened it. She saw that the apartment had been ransacked. A maintenance man entered the apartment and discovered Dawn Dearing's body. Another employee called 911 while the maintenance man stayed by the apartment door until police arrived.

Police officers found Dearing's body on her bathroom floor. She had been severely beaten and repeatedly stabbed. Two objects, a curling iron (turned-on) and a knife handle, had been forced into her vagina. The handle fit a butcher knife blade found next to the body. The blade was consistent with some of the victim's wounds.

The murder remained unsolved for five years. Defendant became a suspect in 1993 when Tucson police received notice from 88–CRIME of an anonymous call.[2] Based on that call, Detective Salgado of the Tucson Police Department submitted a Petition to Obtain Evidence of Physical Characteristics to the court. Salgado stated in the petition that 88–CRIME had informed police of a call indicating defendant was the killer and that defendant "had returned home [the night of the murder] with blood on his clothing and

---

1. It was later established that her blood alcohol content at the time of death was over .35.

2. "The 88–CRIME program allows citizens in Pima County to confidentially communicate information to law enforcement officials about known or suspected criminal activity. To protect these tipsters and the general public's interest in effective law enforcement, the 88–CRIME program publicly guarantees anonymity." 88–CRIME's Motion to Preclude Disclosure.

personal objects belonging to Dawn Dearing."[3] The caller also told 88–CRIME that defendant had been "involved in the death of a prostitute where he reported his vehicle as being stolen." The petition stated that defendant had been arrested for indecent exposure near the scene of the crime about one week before the murder and that fingerprints of defendant on file could neither confirm nor eliminate him as a suspect.

The court issued an order pursuant to A.R.S. § 13–3905 for the temporary detention of the defendant for the purpose of obtaining blood and hair samples, photographs, and fingerprints. The order required that it "be executed as soon as possible" and that defendant could not be detained for more than three hours. Police served defendant with the order the following day at 6:30 a.m. at his parent's home, where he lived. Police told defendant of the contents of the order, had him read it, and told defendant "he had until 9:30," at which time they would give him a ride home.

Police took defendant to the police station, where he was fingerprinted, and took him to Kino Hospital for a blood sample. They then returned to the police station. However, instead of proceeding to obtain hair samples, the one remaining item authorized in the detention order, the detectives placed defendant in a bugged interview room and began a vigorous and lengthy interrogation unaccompanied by a *Miranda* warning.

Among other things, police asked defendant whether, at the time of the murder, he had lived in the same apartment complex where he had been arrested for exposing himself (the apartments bordering Dearing's apartment complex). Defendant answered "probably." Police learned, through this interview, where defendant worked at the time of the murder, his work schedule, and that he had been drinking a lot and using cocaine at the time. In answer to the suggestion that defendant used to go next door to the victim's apartment complex, he answered that he "didn't go over there."

**3.** Later testimony showed that the anonymous caller to 88–CRIME did not identify the victim by

At one point, defendant asked, "Do I need a lawyer or something?" Police told him he was not charged with anything and had not been arrested. Later in the interview, police asked defendant if his prints were in Dearing's apartment. He answered, "I certainly hope not." Detective Salgado asked, "And if they are? ... How would you explain that?" Defendant answered, "I couldn't."

During the interrogation, the detectives learned that the Department of Public Safety had established a match on a palm print. Detective Wright told defendant his prints had been conclusively matched to the print found on the knife used to stab Dearing. She asked defendant once more if he knew how his prints got there. He answered that he did not. Only then was defendant placed under arrest and informed of his *Miranda* rights. Defendant immediately invoked his right to counsel.

Only after defendant's arrest and invocation of his right to counsel did the detectives, for the first time, turn to the matter of hair samples. The State argued on appeal that the police questioned defendant in the bugged interview room only because they were waiting for a qualified individual to arrive to collect the hair samples. However, the transcript of the conversation immediately following the arrest proves that the police were following no such procedure:

> [Detective KW]: We're going to need samples of head hair—and we'll let you pull your head hair.... And we're gonna need a bunch. Unfortunately, they don't want two or three. Why don't you just yank it out ... We need some from the front too ...
>
> [Detective ES]: And from the other side.... Quite a few more....
>
> [Detective KW]: We need about fifty or sixty, unfortunately for you ... I'm going to step out and Ed's going to have you do the same thing but it's going to be pubic hair....
>
> [Detective ES]: And we want about thirty-seven or thirty-eight of these?

name.

[Detective KW]: About thirty to forty, yeah.

[Detective ES]: Okay ... Just reach down there and start pulling some pubic hairs.... A couple more clumps should do it.

Defendant filed a pretrial motion to suppress in which he argued that his statements made prior to his arrest were taken in violation of his *Miranda* rights and should therefore be excluded at trial. The trial court denied the motion.

On the morning of the final day of deliberations, the jurors submitted a note to the trial judge which posed the following question: "*Undecided*–An acceptable vote? Or must a juror vote guilty or not guilty?" The judge conferred telephonically with the lawyers off the record and outside the defendant's presence. The minutes show that "counsel agree[d] that the Court refer the jury to the jury instructions, specifically number 25." Less than an hour and a half after the communication, the jurors returned with a verdict, finding defendant guilty on all counts. Defendant's later motion for new trial, based on the trial court's allegedly erroneous response to the jury's question, was denied. Because we must order a new trial, we do not decide whether the manner of responding to the jury question was erroneous. This problem is unlikely to recur at retrial. We recite the facts of the jury inquiry because it will be used in our harmless error analysis. *See infra*, section 3, 186 Ariz. at 246, 921 P.2d 649.

## ISSUES

Defendant raised a plethora of issues on appeal. Because we must vacate the convictions and remand for a new trial, we do not discuss any sentencing issues that were raised, and we discuss only those trial issues likely to arise at retrial.

## TRIAL ISSUES

1. Whether defendant's right to a speedy trial was violated.

2. Whether there was sufficient evidence to submit the murder, sexual assault, and burglary charges to the jury.

3. Whether the trial court erred in denying defendant's motion to suppress his statements to the police.

4. Whether the trial court erred in failing to suppress the palm print.

5. Whether the trial court erred in failing to instruct the jury, *sua sponte*, on second degree murder.

6. Whether the trial court erred in refusing to appoint second counsel for defendant.

7. Whether the trial court erred in allowing testimony at trial regarding jewelry found at defendant's parents' house.

8. Whether the trial court erred in excluding evidence that another suspect failed a polygraph test.

9. Whether the trial court erred in excluding evidence of police suspicions of other individuals.

10. Whether the trial court erred in excluding evidence of the victim's prior sexual history.

## DISCUSSION

We deal first with two of defendant's arguments which, if successful, would be case-dispositive.

### 1. Was defendant's right to a speedy trial violated?

■ Defendant contends the trial court should have dismissed the case for alleged speedy trial violations. Essentially, defendant argues that his attorney lacked authority to request a trial setting beyond that otherwise permitted by Rule 8. Defendant contends that it was incumbent on the trial court to conduct its own investigation and ascertain whether defendant agreed with his attorney's requested trial date. The trial court has no such obligation, because "the delays sought by [defendant's] attorney are binding on him and have the effect of waiving his right to a speedy trial even though done without his consent." *State v. Zuck*, 134 Ariz. 509, 515, 658 P.2d 162, 168 (1982).

■ The defendant also argues that "the time had already run in [his] case *prior* to his attorney asking that the time limits be

waived." Defendant was arraigned on May 20, 1993. Because he was in custody, Rule 8.2(b), Ariz. R.Crim. P. provides that his trial occur within ninety days of arraignment. However, time during which a stay was issued pending special action is excludable. *McCutcheon v. Superior Ct.*, 150 Ariz. 312, 316, 723 P.2d 661, 665 (1986). There was a stay in this case from August 11, 1993, to September 1, 1993. Counsel waived speedy trial on September 2, 1993, by agreeing to an October 15 trial date. Thus, the waiver, contrary to defendant's contention, occurred well before the time limits of Rule 8 would have elapsed.

## 2. Did the trial court err in denying defendant's motion for directed verdict?

■ Defendant moved for a directed verdict on all counts at the close of the State's case and renewed the motion at the end of all the evidence. On both occasions, the trial court denied the motion. Defendant argues that the evidence was insufficient to submit the issues of murder, sexual assault, and burglary to the jury. The trial court "shall enter a judgment of acquittal ... if there is no substantial evidence to warrant a conviction." Ariz. R.Crim. P. 20 "Substantial evidence" is "evidence that would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is presented." *State v. Atwood*, 171 Ariz. 576, 597, 832 P.2d 593, 614 (1992), *cert. denied*, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). " 'If reasonable [persons] may fairly differ as to whether certain evidence establishes a fact in issue, then such evidence must be considered as substantial.' " *Id.* (quoting *State v. Tison*, 129 Ariz. 546, 553, 633 P.2d 355, 362 (1981), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982)).

We need not lengthen this opinion with a detailed analysis of the evidence and the permissible inferences flowing therefrom. Because we are remanding for a new trial, the trial court will have to rule upon any motion for directed verdict based on the precise record made at retrial. At this point, we need only note that based upon our review of the record which was before the trial court,

that court did not err in denying the motion for directed verdict.

## 3. Did the trial court err in failing to suppress defendant's statement to police?

Defendant contends, and we agree, that police violated his Fifth Amendment rights by interrogating him at the police station without informing him of his *Miranda* rights.

The court entered the order allowing police to obtain evidence of physical characteristics on April 27, 1993, and police served the order the following day. The order authorized the police to detain defendant for a maximum of three hours for the purpose of obtaining blood and hair samples, photographs, and prints. When the police executed the order, they first obtained the prints and blood samples and then, without attempting to secure hair samples (which would have exhausted their authority to detain defendant), took defendant to a bugged interview room where they extensively interrogated him without informing him of his *Miranda* rights. Once the police received the results of the fingerprint analysis, they advised defendant of his rights and placed him under arrest. At this point, defendant invoked his right to counsel, and the detectives at last directed their attention to the hair samples.

■ We will not disturb a trial court's ruling on a motion to suppress absent clear and manifest error. *State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948, *cert. denied*, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991). *Stanley* involved the threshold issue of custody. We held that "[w]hether one is in custody is determined objectively: Under the circumstances, would a reasonable person feel deprived of his freedom of action?" 167 Ariz. at 523, 809 P.2d at 948. According to *Stanley*, "[f]actors indicative of custody include: (1) whether the objective indicia of arrest are present; (2) the site of the interrogation; (3) the length and form of the investigation; and, (4) whether the investigation had focused on the accused." *Id.*

■ We believe this is a case of clear and manifest error under *Stanley*. It is difficult

to imagine, short of a formal arrest, a more "custodial" situation than that in which defendant was placed. Police arrived at his home at 6:30 a.m., presented him with a detention order, told him that he had to accompany them for a period of three hours, took him to the police station, and proceeded to interrogate him about the murder in a bugged interview room. Defendant was the only suspect under investigation.

The police were authorized to detain defendant for up to three hours for the limited purpose of collecting certain specified types of physical evidence. The police chose to step beyond the bounds of the court order and interrogate defendant without advising him of his rights. The detectives did not inform defendant that he was free to leave. In fact, the earlier statements by police informed defendant that they "had until 9:30." *See supra* at 242–43, 921 P.2d at 645–46. A person in such circumstances would undoubtedly succumb to the Tucson Police Department's invalid interpretation of the Petition, *i.e.*, that it justified a three hour free-for-all with defendant. A reasonable person would not be in a position to question the validity of the officers' statement that they "had until 9:30." A reasonable person would assume that the police understood the boundaries of the law. As the behavior of the officers demonstrates, this assumption would be ill-founded.

The State cites *State v. Roscoe*, 145 Ariz. 212, 222, 700 P.2d 1312, 1322 (1984), *cert. denied*, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985), for the proposition that a temporary detention to obtain physical evidence pursuant to A.R.S. § 13–3905 does not satisfy the threshold *Miranda* requirement that the defendant be in police custody. In *Roscoe*, defendant was given *Miranda* warnings and interviewed voluntarily. *Id.* The following day, the police took him from his home pursuant to a § 13–3905 order. *Id.* The defendant asked for his lawyer and was told he could not interfere with the order. *Id.* The defendant, after providing samples, was questioned by the police without again being given *Miranda* warnings. *Id.*

█ In *Roscoe*, we held that the questioning did not rise to the level of custodial interrogation. *Id.* However, *Roscoe* involved facts critically different from those involved here. In *Roscoe*, the defendant admitted at the suppression hearing that he knew he was not under arrest during the detention and knew that he could call a lawyer or leave the police station. *Id.* No such evidence exists in this case. The police should not be permitted to use orders to obtain physical evidence as an end run around the requirements of *Miranda*.

█ When the State violates a defendant's Fifth and Fourteenth Amendment rights, his conviction may still stand if the error is found to be harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). When statements should have been suppressed as violative of *Miranda*, "the appellate court ... simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Id.*

█ In a case such as this, where the physical evidence connecting the defendant to the crime hinges upon a single palm print, we cannot say the error was harmless. Defendant did not testify at trial, but police used the improper interrogation to acquire statements from him. The State then used these statements to show that defendant had once lived in the apartments where the victim was found, that he said he never returned to those apartments for social visits, that he lived in the apartments adjacent to the victim's apartment at the time of the murder, and that he would have no explanation if his prints were on the murder weapon. These statements placed defendant near the crime scene and seriously undermined the plausibility of the defense theory that defendant may have left his print on the knife while attending a social visit or barbecue at the victim's apartment building.

Defendant argues that the error is not harmless. The State does not argue to the contrary. The State thus concedes the point. Moreover, it is clear from the jury's question, described above in the statement of facts, that the jury (or at least one juror) was having great difficulty deciding the case. We

do not reach the question of whether the substance and manner of the trial court's response to the jury's question was error because it is unlikely to recur at retrial. However, the fact that the jury asked the question weighs heavily in our consideration of whether the error in admitting defendant's statement was harmless. The paucity of evidence in this case, the use of illegally obtained evidence, the jury's question, and the State's concession on this point combine to prevent us from finding beyond a reasonable doubt that the constitutional error was harmless.

**4. Did the trial court err in failing to suppress the palm print?**

Defendant contends that A.R.S. § 13–3905, which permits temporary detention of an individual to obtain physical characteristics, violates the Fourth Amendment because it permits such temporary detention on less than probable cause. The State contends this argument is precluded because it was not raised below. Our reading of the record does not clearly support a finding of waiver, so we reach the merits. Because the State used a palm print but no blood or hair samples at trial, we confine our discussion to prints.

**A. Does the United States Constitution require a probable cause showing for an order to obtain evidence of prints?**

■ Defendant argues that this court should overrule *State v. Stanhope,* 139 Ariz. 88, 676 P.2d 1146 (App.1984), and "find that full blown probable cause is required for the issuance of a warrant for the taking of physical characteristics." Defendant's contention is that "[t]he [United States Supreme] Court held [in *Davis v. Mississippi,* 394 U.S. 721, 727–28, 89 S.Ct. 1394, 1398, 22 L.Ed.2d 676 (1969) ] that probable cause to believe the person to be fingerprinted committed the crime is necessary prior to detaining him for fingerprinting." *Davis* stands for no such proposition. In *Davis,* the Court held:

> Fingerprinting involves none of the probing into an individual's private life ... that marks an interrogation or search.... We

have no occasion in this case, however, to determine whether the requirements of the Fourth Amendment could be met by narrowly circumscribed procedures for obtaining, during the course of a criminal investigation, the fingerprints of individuals for whom there is no probable cause to arrest.

*Id.* Defendant also argues that *Hayes v. Florida,* 470 U.S. 811, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), requires a showing of probable cause in order to detain a suspect for fingerprinting. Defendant recognizes that in *Hayes* there was no judicial authorization for the detention but argues the lack of a court order "cannot sufficiently distinguish the instant case to save it." This argument ignores the language in *Davis* indicating that narrowly defined, non-repetitive fingerprinting procedures authorized by a judicial officer do not necessarily violate the Fourth Amendment.

This court has not yet explicitly held that a showing less than probable cause can provide grounds for an order to obtain physical evidence. In *State v. Via,* 146 Ariz. 108, 112–13, 704 P.2d 238, 242–43 (1985), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1268, 89 L.Ed.2d 577 (1986), we addressed the constitutionality of A.R.S. § 13–3905. In that case, defendant conceded that the police had probable cause to arrest him. *Id.* at 113, 704 P.2d at 243. The court held that "[f]or our purposes in this case, probable cause and reasonable cause will be treated as the same." *Id.* at 113 n. 1, 704 P.2d at 243 n. 1. Because *Via* involved an order issued on probable cause, this court avoided the question of whether the A.R.S. § 13–3905 "reasonable cause" requirement is in every case equivalent to a probable cause requirement.

However, *Via* cites both *Davis* and *State v. Grijalva,* 111 Ariz. 476, 533 P.2d 533, *cert. denied,* 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975). *Via,* 146 Ariz. at 113, 704 P.2d at 243. Both *Davis* and *Grijalva* are premised on the notion that "[a] temporary detention order is not ... of the stature of a warrant necessitating probable cause." *Grijalva,* 111 Ariz. at 478–79, 533 P.2d at 535–36 (noting that *Davis* "left open the question of whether procedures might be developed for obtaining fingerprints when

probable cause for arrest was lacking"). Although *Via* can be read to define reasonable cause as probable cause, 146 Ariz. at 113 n. 1, 704 P.2d at 243 n. 1 (citing *Gortarez v. Smitty's Super Valu, Inc.*, 140 Ariz. 97, 103, 680 P.2d 807, 813 (1984)),[4] that opinion seems to have dismissed the issue rather than to have decided it. The court of appeals has consistently construed the decision of this court in *Grijalva*, in light of *Davis*, as requiring a lesser showing than probable cause. *See, e.g., State v. Wedding*, 171 Ariz. 399, 402–05, 831 P.2d 398, 401–04 (App.1992); *State v. Stanhope*, 139 Ariz. at 91, 676 P.2d at 1149. We find this interpretation of *Via*, which takes into account *Via*'s reliance on *Grijalva* and *Davis*, to be the better approach. Reasonable cause, which is something less than probable cause, is sufficient to invoke A.R.S. § 13–3905.

**B. Was the order to obtain physical characteristics issued on a showing of reasonable cause?**

Defendant alternatively contends that, even if probable cause is not required, the discovery order in this case was issued without a showing of reasonable cause. He asserts that the 88–CRIME tip, upon which the petition to obtain evidence was based, provided no indicia of reliability of the tipster, and suggests that the police supplied information in the petition under the pretense that it was part of the tip. The trial court rejected this claim.

This court held in *Stanley* that it would "not disturb a trial court's ruling on a motion to suppress absent clear and manifest error." 167 Ariz. at 523, 809 P.2d at 948. In order for a proper finding of reasonable cause to be made pursuant to A.R.S. § 13–3905, "a nexus must be established between the person detained and the crime being investigated." *Via*, 146 Ariz. at 114, 704 P.2d at 244.

Defendant contends that the 88–CRIME tip was unreliable. He urges us to overrule *Stanhope* and *State v. Summerlin*, 138 Ariz. 426, 675 P.2d 686 (1983), in which anonymous tips have been held to be reliable, arguing

that those decisions are in conflict with the decisions of the United States Supreme Court in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and *Alabama v. White*, 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990).

This argument is without merit. *Gates* addressed the issue of probable cause to obtain an arrest or search warrant, which turns on a different standard than that involved here. 462 U.S. at 225–46, 103 S.Ct. at 2325–36, 76 L.Ed.2d 527. *White*, on the other hand, involved the issue of what constitutes reasonable suspicion in order to justify a *Terry* stop by the police. 496 U.S. at 326–27, 110 S.Ct. at 2414. Because *White* did not involve an order obtained from a neutral and detached magistrate prior to the detention, it is inapposite here. *See Ornelas v. United States*, —— U.S. ——, —— – ——, 116 S.Ct. 1657, 1661–64, 134 L.Ed.2d 911 (1996) (holding standard of review used in warrantless searches is *de novo* ).

The affidavit seeking the order in this case reported that the 88–CRIME caller said that defendant was responsible for the homicide and that he had returned home the night of the homicide with blood on his clothes and property belonging to the victim (the call also referred to another homicide allegedly committed by defendant). In addition, the petition showed that a comparison of defendant's fingerprints with those taken at the scene could neither confirm nor eliminate defendant as a suspect and that defendant had been arrested near the scene of the crime for exposing himself shortly before the homicide.

Arizona cases support the finding that the petition contained sufficient information to constitute reasonable cause for the issuance of an order to obtain fingerprints. In *Via*, the defendant was convicted of first degree murder after he lured a real estate agent into the desert, robbed and killed him. 146 Ariz. at 110–11, 704 P.2d at 240–41. Another agent told the police he had nearly been a victim of the same scheme but that he had

---

**4.** *Gortarez* does not involve A.R.S. § 13–3905 but reasonable cause as it relates to the shopkeeper's privilege. 140 Ariz. at 103, 680 P.2d at 813.

refused to meet the killer in the desert. *Id.* at 111, 704 P.2d at 241. The police sought to detain the defendant in order to have the agent identify him. *Id.* at 112, 704 P.2d at 242. In seeking the temporary detention order, the police provided an affidavit which stated only that the affiant had reasonable cause to believe that defendant had committed a forgery and that he was needed for identification purposes. *Id.* at 114, 704 P.2d at 244. This court held that the order's failure to name the identifying tipster was not fatal error. *Id.*

Similarly, in *Grijalva*, where the validity of the petition was sustained, the " 'Petition to Obtain Evidence of Physical Characteristics' ... stated that Grijalva was a suspect because he fit[ ] the general description ...; because of 'a similarity of *modus operandi*,' and because the latent prints taken at the scene had been tentatively matched to a 'very poor specimen of Grijalva's known fingerprint.' " 111 Ariz. at 479–80, 533 P.2d at 536–37. The petition in this case contained more than unverifiable information from an anonymous tip. In addition to the tip that identified defendant as the murderer, the petition indicated that latent fingerprints could not exclude defendant as a suspect and that defendant had previously been arrested near the scene of the crime for exposing himself. This constitutes evidence sufficient to support a finding of reasonable cause in support of a petition for temporary detention under § 13–3905. Accordingly, the trial court did not abuse its discretion in denying the motion to suppress the palm print.

## 5. Did the trial court err in failing to instruct the jury, *sua sponte*, on second degree murder?

Defendant first submitted, and then withdrew, proposed jury instructions on lesser-included offenses of first degree murder. Ultimately, at defendant's request, the trial court instructed the jury only on first degree murder. Defendant now claims on appeal that the trial court should have, *sua sponte*, instructed the jury on second degree murder, even though his trial counsel asked the trial court not to do so.

We believe defendant has waived this issue. *See State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995). In *Krone*, this court held that second degree murder instructions are not always required under *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), even when warranted by the evidence. *Id.* According to our approach in *Krone*, if the evidence supports the second degree murder instruction, the trial court should offer one. *Id.* If the defendant agrees, the instruction is given. *Id.* If he objects, the instruction should not be given. *Id.* *Krone* does not address a situation in which the defendant withdraws the instruction rather than objecting to it. However, the logic of that case indicates that defendant's affirmative act of withdrawing the instruction is tantamount to an objection to the instruction. Defendant's affirmative withdrawal of the second degree murder instruction therefore precluded the trial court from giving the instruction.

We also question whether the present record would support an instruction on second degree murder. Because we must remand for a new trial, we do not reach the merits. At retrial, the trial court will have to evaluate the parties' requests for lesser included instructions, if any, based on the record as it then exists.

## 6. Did the trial court err by refusing to appoint second counsel for defendant?

Defendant invites this court to read into the United States and Arizona constitutions a requirement that second counsel be appointed in all capital cases. We have held that the constitutional right to counsel in a capital case is fulfilled "[w]hen a qualified member of the State Bar is assigned to represent defendant and acts diligently on his behalf ..." *State v. Schaaf*, 169 Ariz. 323, 330, 819 P.2d 909, 916 (1991), *cert. denied*, —— U.S. ——, 116 S.Ct. 948, 133 L.Ed.2d 873 (1996). To date, we have not adopted any rule requiring two attorneys in capital cases, and we decline to do so here. *But see* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 2.1 (1989) (recommending two counsel be assigned in all capital cases).

**7. Did the trial court err in allowing testimony regarding the earrings found at defendant's parents' home?**

After defendant's arrest, police searched his parents' home pursuant to a warrant and found several earrings among defendant's belongings. At trial, a witness said that one of the earrings "looks something similar to what [Dearing] would wear." Defendant argues that the trial court should have excluded this testimony based on its relevance and improper foundation objections.

 Absent a clear abuse of discretion, we will not second-guess a trial court's ruling on the admissibility or relevance of evidence. *State v. Amaya–Ruiz*, 166 Ariz. 152, 167, 800 P.2d 1260, 1275 (1990), *cert. denied*, 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). The inability of a witness to positively identify an item in evidence goes to the weight of the evidence, not its admissibility. *State v. Atwood*, 171 Ariz. 576, 643, 832 P.2d 593, 660 (1992) (holding testimony of victim's mother to be relevant where she identified underwear as the type her daughter might wear). Although the relevance of this testimony based on this record seems questionable, we are not prepared to say that the trial court abused its discretion in permitting the testimony.

 Also, we note that where a partial foundation exists, it is incumbent upon the objecting party to specify what foundation is lacking so that the introducing party may address the issue. *See Packard v. Reidhead*, 22 Ariz.App. 420, 423, 528 P.2d 171, 174 (1974). While defendant made a foundation objection at trial, he did not indicate what foundation was lacking.

Defendant argues that admission of the earring testimony, even if relevant, was unfairly prejudicial because it invited the jurors to speculate that defendant was a mass murderer who collected earrings from each of his victims. However, the State made no such argument or suggestion, and defendant defeated any such inference by introducing testimony that some of the earrings were of the type worn by his wife. Although we may disagree with the trial court's decision to admit the evidence, this decision was within the discretion of the trial court. At retrial, the trial court can consider whether to admit the earring testimony based upon the record as it then exists.

**8. Did the trial court err in refusing to admit evidence that another suspect had failed a lie detector test?**

 Defendant argues that he should have been permitted to show that the victim's co-worker, who had been drinking with her on the night of her murder, failed a lie detector test. This court has consistently held that evidence of a polygraph test is inadmissible absent stipulation of the parties. Defendant asks this court to reconsider this line of cases in light of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597–99, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993), which held that the *Frye* test of general acceptance was no longer the test for the admissibility of scientific evidence in federal courts. The Court held in *Daubert* that federal trial judges must ensure that testimony rests on a reliable foundation and is relevant according to the dictates of Rule 702, Fed. R.Evid.

*Daubert* modified existing federal law only insofar as it changed the standard for the introduction of scientific evidence from one of general acceptance to one of reliability as determined by the trial judge. 509 U.S. at 597–99, 113 S.Ct. at 2799. We have not yet decided whether to adopt the *Daubert* rule in Arizona, *see State v. Bible*, 175 Ariz. 549, 580, 858 P.2d 1152, 1183 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994), but we have consistently held, as a matter of law, that polygraph evidence is not reliable. *See, e.g., State v. Ikirt*, 160 Ariz. 113, 115, 770 P.2d 1159, 1161 (1987), *cert. denied*, 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 156 (1989) (and cases cited therein). The trial court did not err in excluding the proffered polygraph evidence.

**9. Did the trial court err in precluding defendant from presenting evidence regarding police suspicions of other persons?**

Defendant claims that the trial court erroneously prevented him from introducing evi-

dence that the police had previously suspected other people of committing the crime. He contends that although he was prevented from discussing the mental processes of police regarding the investigation, the State was allowed to discuss the subject at will.

█ The State made a motion in limine to prevent defendant from asking police about their suspicions regarding other potential suspects in the case. The court ruled that defendant could introduce evidence tending to show that someone else was the murderer but could not introduce evidence of the mental impressions of the police. The trial court held that "the subjective suspicions of the police and their reasons to arrest are not probative of someone's culpability." (citing *State v. Oliver*, 169 Ariz. 589, 591, 821 P.2d 250, 252 (App.1991)).

Defendant argues that the State itself improperly discussed police suspects in its opening statement. However, the State merely explained to the jury that the police took fingerprints and physical specimens from an Art Garcia but could not place him at the scene of the crime. Defendant also claims that the State was allowed to question Detective Salgado about the investigative leads in the case. In fact, the record shows that the State made a point of asking Salgado only about the evidence he collected from other suspects and not about his subjective beliefs and suspicions.

**10. Did the trial court err in preventing the introduction of evidence of the victim's prior sexual history?**

█ Defendant objects to the fact that the trial court did not allow him to present evidence of the victim's prior sexual history. The trial judge allowed the defendant to introduce all the evidence he could muster regarding whether men were seen coming and going from the victim's apartment. Defendant was simply precluded from introducing evidence which would have focused on whether the victim had "loose morals" because she allegedly picked up men in bars, had sexual relations with her co-worker, or went to the pool nude. The trial court determined that none of these proffered pieces of evidence addressed the issue of whether defendant or another committed the crime.

The victim did not consent to being stabbed, beaten, and killed. The issue of whether she had sex with certain other men, or behaved in some sexually inviting manner, is absolutely irrelevant to the issue of whether a person other than the defendant killed her. It was well within the discretion of the trial court to have found, consistent with *State ex rel. Pope v. Superior Ct.*, that references to the victim's sexual habits would " 'inject[ ] collateral issues into the case which ... divert the jury's attention from the real issue, the guilt or innocence of the accused.' " 113 Ariz. 22, 28, 545 P.2d 946, 951 (1976) (quoting *Wynne v. Commonwealth*, 216 Va. 355, 218 S.E.2d 445, 446 (1975)).

Defendant maintains that the trial court adhered to a double standard by allowing the State to bring up evidence that the victim "liked hispanic men." Defendant did not object to the introduction of such evidence at trial and may have made a strategic decision not to object because this evidence supported his theory of the case as much as it supported the State's theory. In any event, defendant has waived the issue. *See State v. Diaz*, 168 Ariz. 363, 366, 813 P.2d 728, 731 (1991).

## CONCLUSION

Because we cannot say that the use of evidence obtained by the Tucson Police Department in violation of defendant's *Miranda* rights was harmless error, defendant is entitled to a new trial. Defendant's convictions are vacated, and this case is remanded to the trial court for a new trial in accordance with this opinion.

FELDMAN, C.J., ZLAKET, V.C.J., and MARTONE and ROBERT J. CORCORAN (Retired), JJ., concur.