945 P.2d 1260

**STATE of Arizona, Appellee,**

v.

**Christopher John SPREITZ, Appellant.**

**No. CR–94–0454–AP.**

Supreme Court of Arizona,
En Banc.

Sept. 11, 1997.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Division, Jon G. Anderson, Assistant Attorney General, Phoenix, for Appellee.

Law Office of David Alan Darby by David Alan Darby, Julie L.C. Duvall, Tucson, for Appellant.

## OPINION

JONES, Vice Chief Justice.

Christopher John Spreitz (defendant) was convicted of first degree murder, sexual assault, and kidnapping. His victim was Ruby Reid. The trial court sentenced Spreitz to death for the murder and to fourteen-year consecutive prison terms for each of the non-capital convictions. Appeal to this court for the death sentence is mandatory. Ariz. R.Crim. P. 26.15 and 31.2(b). This court has jurisdiction under Arizona Constitution article VI, section 5(3), and Arizona Revised Statutes sections 13–4031 and –4033(A). We affirm.

## I. Facts

On May 18, 1989, Ruby Reid spent the evening at the Red Dog Saloon in Tucson. She had been a regular patron for a number of years. On the night in question, a bartender friend saw Ms. Reid leave the bar at approximately 11:30 p.m. Because she did not own a car and the bar was near her home, she was on foot as usual.

Meanwhile, defendant spent several hours drinking with his roommate at another bar in the vicinity. At about midnight, defendant and his roommate returned home. The roommate's girlfriend testified that shortly after they arrived, defendant remarked that he was going out to see if he could "pick up a date."

Between 12:35 and 12:45 a.m., Tucson Police Officer Ramon Batista noticed a man he later identified as defendant drive into a convenience store parking lot across the road from where Batista was parked. Officer Batista noted the make and color of defendant's car. After watching defendant talk to another man for a few minutes, Officer Batista drove through the convenience store parking lot, observing that defendant was wearing torn jeans over spandex shorts and a white T-shirt.

At approximately 1:45 a.m., Officer Batista again noticed defendant's car in downtown Tucson. Contrary to the earlier convenience store sighting where the officer recalled the car was running cleanly, the car was now smoking heavily and leaving a trail of oil. Officer Batista pulled defendant over, and with defendant out of his car, observed that his hands, arms, legs, shoes, and shirt appeared to be smeared with blood and fecal matter, his shirt was torn, and he smelled of feces. The officer noted that defendant had removed his jeans and was now wearing spandex shorts with the same T-shirt. Explaining his condition, defendant said he had fought with the man seen with him by the officer earlier that evening.

Another police officer, Sergeant Victor Chacon, drove by and stopped when he observed defendant's appearance. Sgt. Chacon expressed concern about the condition of the man with whom defendant had allegedly fought and asked defendant to take the officers to the scene of the fight. Defendant rode unrestrained in the back seat of Officer Batista's patrol vehicle. Upon arrival at the purported scene, however, the officers were unable to find any signs of an altercation, injuries to the other man, or the cause of the oil leak in defendant's car. Sgt. Chacon called another police officer to take photographs of defendant, who consented to being

photographed. Officer Batista noticed that defendant was flushed and his breath smelled of beer and concluded that he had been drinking. However, Officer Batista also testified that defendant's actions evidenced no physical or mental impairment. Officer Batista issued defendant a repair order for his car and released him no later than 2:30 a.m. Friday, May 19. After defendant arrived home a short time later, he told his roommate's girlfriend that he had had a fight with a man and he was not certain if the man were alive or dead.

On Monday morning, May 22, a horseback rider discovered Ruby Reid's naked and decomposing body in the desert on the outskirts of Tucson. At the scene, police detectives observed tire tracks leading back to the pavement, oil stains in the dirt, footprints, and drag marks in the dirt leading away from the body. They also found feces-stained pants, tennis shoes, socks, a used tampon, and a torn brassiere. Two blood-stained rocks lay next to the body.

The medical examiner testified that, due to the advanced state of decomposition, he could not determine the full extent and nature of the victim's injuries. For the same reason, the examiner was unable to confirm or reject the presence of semen. The injuries he was able to catalog included: bruising on the legs, arms, and back; bruising and abrasions on the buttocks; several broken ribs; internal bleeding; a broken jaw; several head lacerations; and a skull fracture where the skull had been "shoved in." The examiner concluded that the cause of death was blunt-force trauma to the head.

The police were initially unable to develop leads in the case. However, on Wednesday, May 24, at the police station, the officer who had photographed defendant the previous Friday morning encountered the investigating detective in the Reid murder. The events of Friday morning, May 19, were mentioned during their conversation, causing the detective to sense that the blood- and feces-covered driver might be connected to the murder. Accordingly, the detective obtained a search warrant for defendant's apartment and car. In addition, the detective ran a computer check and discovered that defendant was subject to several outstanding warrants for unsatisfied traffic citations. The defendant was at home when the detective and other officers executed the warrant at 1:30 a.m. on May 25 and arrested him based on the outstanding warrants.

At the police station, defendant was advised of his *Miranda* rights and, upon questioning, confessed to the murder of Ruby Reid. He claimed that he "picked up" Ms. Reid at a convenience store and that she voluntarily went with him, intending to "party." After they arrived in the desert, defendant said that Ms. Reid reneged on her promise to have sex with him and that they fought. He stated that Ms. Reid slapped him and that he punched her in the mouth. He admitted further that he removed her clothing and had vaginal intercourse with her. Finally, defendant confessed that he hit Ms. Reid in the head with a rock more than once to make her stop yelling. He then left, not knowing if she were alive or dead. Shortly thereafter he was stopped in downtown Tucson by Officer Batista.

When the detectives searched defendant's car, they found blood spatter in various locations inside the trunk. The investigating criminologist was able to determine that some of the blood was not consistent with defendant's blood characteristics.

## II. Procedural History

### A. The Arrest, Indictment, Pretrial Proceedings, and Trial

Defendant's arrest occurred May 25, 1989. On June 2, 1989, he was indicted by a grand jury on counts of first degree murder, sexual assault, and kidnapping. The trial court fixed a pretrial conference date for August 8, 1989, but continued it at defendant's request until August 30. At the pretrial conference on August 30, defendant waived his Rule 8 speedy trial rights, and the court set trial for February 14, 1990. Defendant thereafter waived Rule 8 speedy trial rights in writing numerous times, obtaining several new trial dates between August 8, 1989, and April 23, 1991. The reasons for continuing the trial included claims that analysis of DNA evidence was not yet complete, that defendant

was attempting unsuccessfully to engage another attorney, that defense counsel was ill, and that defense counsel had not received materials necessary to interview an FBI laboratory supervisor.

In April 1991, defendant requested that the court continue the trial date pending a *Frye* hearing to determine admissibility of the state's DNA evidence. On April 23, 1991, defense counsel waived the Rule 8 speedy trial requirements to accommodate the *Frye* hearing. The court consolidated defendant's action with another case for purposes of the *Frye* hearing and did not at that time set a new trial date.

In April 1992, defense counsel requested a stay in the *Frye* hearing while she filed a petition for special action with the court of appeals regarding the scope of the hearing. The court of appeals declined to accept jurisdiction in June 1992. Defendant immediately filed a petition for special action with this court, again requesting a stay and a determination of scope. The trial court continued the proceedings several more times while awaiting disposition of the special action in this court. In a letter dated August 19, 1992, the trial judge wrote this court asking for an early ruling on the petition for review. This court denied review of the special action in October 1992.

In August 1993, the trial court required the parties to brief and argue the effect of this court's decision in *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), on the DNA hearing. After oral argument on October 4, 1993, the trial court took the matter under advisement. In December 1993, the trial court ruled that DNA evidence would be admissible if certain foundational requirements were met. In February 1994, the court set a hearing on pending motions for the following April and reset the trial for June 28, 1994.

In May 1994, defendant filed motions to suppress evidence gathered during his arrest, search, and detention, all of which defendant alleges were illegally conducted. The court heard oral argument on July 6 and denied all motions by order dated July 19, 1994. Meanwhile, the trial court had contin-

ued the trial from June 28 to August 9, 1994 at the request of defense counsel.

Against all expectations, the admissibility hearings did not conclude until June 3, 1994 when the court precluded the use of DNA evidence as a sanction because of the state's failure to disclose a witness. During the three-year period between April 1991 and June 1994, the trial court continued the hearing repeatedly at the request of both the defendant and the state and granted the parties time to analyze complex DNA evidence and to arrange for the appearance of numerous expert witnesses. The court also allowed defense counsel to withdraw and appointed substitute counsel.

On June 16, 1994, defendant filed a motion to dismiss for speedy trial violations under Rule 8, Arizona Rules of Criminal Procedure. The court heard arguments on June 28, 1994, and denied the motion on July 25, 1994.

The trial finally began on August 9, 1994, and lasted seven days. On August 18, 1994, the jury returned the following guilty verdicts: first degree murder (both premeditated and felony murder), sexual assault, and kidnapping.

## B. The Sentencing

The court conducted defendant's aggravation-mitigation hearing on November 28, 1994, and found aggravation under A.R.S. § 13-703(F)(6), concluding that Ms. Reid's murder was committed in an especially cruel manner. As nonstatutory mitigating factors, the court determined that defendant was raised in a "sub-normal" home environment, that he had been emotionally immature at age twenty-two when the crime was committed but had shown emotional growth while in confinement, that he had no prior felonies, and that he was capable of rehabilitation. After considering the aggravating and mitigating factors, the court imposed the death penalty. The judge concluded that the especially cruel manner in which the victim died substantially outweighed all mitigating factors, whether considered separately or together.

## III. Issues

### A. Trial Issues

#### 1. Speedy trial

Defendant argues that the trial court erred in not granting his motion to dismiss for violation of his right to a speedy trial pursuant to Rule 8 of the Arizona Rules of Criminal Procedure. In addition, defendant asserts that he was denied speedy trial rights under the Due Process Clauses of the United States and Arizona Constitutions.[1]

##### a. *Rule 8 speedy trial*

■ Rule 8 grants even "stricter speedy trial rights than those provided by the United States Constitution." *State v. Tucker,* 133 Ariz. 304, 308, 651 P.2d 359, 363 (1982) (citing *State ex rel. Berger v. Superior Court,* 111 Ariz. 335, 529 P.2d 686 (1974)). Here, defendant complains that his case was not given priority as required under Rule 8.1, that nonexcluded time over the five-year period between his arraignment on June 12, 1989, and the beginning of his trial on August 9, 1994, exceeded the Rule 8.2 time limits, and that several continuances granted by the court extended beyond the Rule 8.5 thirty-day limit. We have determined, on the entire record, that defendant has waived his rights under Rule 8.

Rule 8.2(b) provides that a defendant who is in custody for criminal charges "shall be tried ... within 120 days from the date of the person's initial appearance before a magistrate ... or within 90 days from the date of the person's arraignment ...," whichever is the lesser." Defendant was arrested on May 25, 1989, indicted on June 2, 1989, and arraigned on June 12, 1989. In the absence of intervening events, defendant's trial was required to commence by September 10, 1989 to avoid violating Rule 8. His trial finally began on August 9, 1994, more than five years after the indictment.

The trial court ruled that defendant's Rule 8 rights had not been violated because: (1) there was a presumption that all continuances granted by the trial court were indispensable to the interests of justice, even though it was likely that the Rule 8.2 limits had been exceeded; (2) defendant had expressly waived his rights on numerous occasions; (3) defendant impliedly waived speedy trial rights by failing to assert the same before the applicable deadlines; and (4) defendant violated his obligations under Rule 8 by failing to advise the court of the imminence of Rule 8.2 deadlines.[2]

■ A trial court's ruling will be upheld unless an appellant demonstrates that the court abused its discretion and that prejudice resulted. *See State v. Lukezic,* 143 Ariz. 60, 68, 691 P.2d 1088, 1096 (1984). Moreover, the determination of abuse of discretion depends on the facts of each case. *See State v. Mendoza,* 170 Ariz. 184, 194, 823 P.2d 51, 61 (1992). On the facts of this case, we find the trial court did not abuse its discretion, and defendant's Rule 8 speedy trial rights were not violated.

##### (i) *Undisputed time waived by defendant*

Defendant concedes that he waived Rule 8 time from August 8, 1989, the date set for the first pretrial conference, through April 23, 1991, a period of roughly twenty months. Our review of the record confirms the following sequence of events. Defendant continued the pretrial conference three times between August 8 and August 30, 1989. On August 30, the trial court counseled defendant about his right to insist on a trial within the Rule 8 limits. Defendant knowingly and intentionally waived his right, agreeing to a trial date of February 14, 1990. On January 25, 1990, defendant again agreed to waive his Rule 8.1 speedy trial rights, and the court continued trial to April 3, 1990. Defendant

---

1. The Sixth Amendment of the United States Constitution reads: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial...." Arizona Constitution article 2, section 24 requires: "In criminal prosecutions, the accused shall have the right ... to have a speedy public trial...."

2. The court concluded, "by failing to notify the court of the impending passage of 150 days prior to such passage, [defendant] has violated his obligations under Rule 8 of the Arizona Rules of Criminal Procedure." Because the defendant was in custody, the correct time limit applicable under Rule 8.2(b) was 90 days, not 150 days.

filed a signed waiver of his Rule 8.2(b) rights, expressly acknowledging that the trial date would fall outside the 8.2 time limits.

On April 2, 1990, defendant informed the court that his mother was attempting, on his behalf, to engage new counsel. After defendant freely waived his Rule 8 rights, the court set a tentative trial date of May 4, 1990. On May 4, 1990, defendant again requested a continuance of the trial because his mother had not yet engaged another attorney. With defendant's express waiver under Rule 8, the court set a trial date of September 11, 1990. On September 11, 1990, however, defendant again filed a motion to continue, citing as reasons for delay that interviews of witnesses were not complete, defense counsel had not been able to hire all of the experts needed to testify regarding the admissibility of DNA evidence, and defense counsel had been ill for several weeks. As was customary, the trial court again advised defendant of his right to an immediate trial or a continuance of no more than thirty days. Defendant once more waived this right and agreed to a trial date of January 24, 1991.

On January 14, 1991, defendant moved to continue because the parties needed more trial preparation, due particularly to the complexity of the DNA evidence and because the court would need to conduct a *Frye* hearing prior to admitting any such evidence at trial. Again, defendant filed a signed acknowledgment and waiver under Rule 8.2. Finally, on April 23, 1991, defendant requested a continuance of the trial date in order to conduct a *Frye* hearing. The court approved the continuance without setting a new trial date, although it was apparently the court's understanding that the hearing would take at least two months. Defense counsel avowed that his client again would waive Rule 8 time limits to permit the continuance. Although defense counsel assured the court that defendant would provide yet another written acknowledgment and waiver of Rule 8, this waiver does not appear in the record.

On this record, we find that defendant did waive his Rule 8 speedy trial rights between August 8, 1989 and April 23, 1991. Rule 8.4(a) allows the exclusion from Rule 8.2 time limits for delays "occasioned by or on behalf

of the defendant." All trial delays during this period were clearly brought about by defendant and were thus properly excluded within the province of Rule 8.4(a). Significant to this opinion, we find that defendant repeatedly and knowingly waived his Rule 8 speedy trial rights during this period, usually by filing with the court a signed acknowledgment recognizing that the continuances requested would move his trial outside the Rule 8.2 limits.

### (ii) *Disputed waived time*

From April 23, 1991 through the conclusion of pretrial evidentiary hearings on June 3, 1994, defendant did not expressly waive his Rule 8 time. However, the record does not demonstrate that defendant ever made an affirmative assertion of speedy trial rights until his motion to dismiss on June 16, 1994, twelve days before his scheduled trial date of June 28. We turn attention, therefore, to the question whether defendant waived Rule 8 time during this period, and if so, whether the time waived brings his trial within Rule 8.2 limits.

Our review of the record indicates that the protracted *Frye* hearings were frequently stalled by disputes over discovery, motions to reconsider the court's rulings, and requests by the court for memoranda on points of law. In addition, between April 6 and November 9, 1992, the court continued the hearings while defendant filed special actions relating to the scope of *Frye*, first with the court of appeals, and then with this court. On August 17, 1993, the trial court asked the parties to brief and argue the effect of *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), on the hearings and then on December 3, 1993, issued findings of fact and conclusions of law regarding various DNA evidentiary issues. After the court ruled the DNA evidence admissible on December 3, 1993 and denied defendant's motion to reconsider on January 12, 1994, it held hearings in which the state was required to establish foundation for the admission of specific DNA evidence. Previously, on February 18, 1994, the court had set a hearing on pending pretrial motions for April 27, 1994, and trial for June 28, 1994.

During a foundation hearing on June 3, 1994, because the state failed to disclose a material witness, the court determined to preclude the state's use of all DNA evidence. On June 16, 1994, twelve days before his trial was scheduled to start, defendant filed a motion to dismiss for speedy trial violations. The next day, defendant moved to continue the pretrial hearing and trial due to conflicts with defense counsel's schedule, and the court reset the hearing and trial for June 28 and August 9, 1994, respectively. On August 4, 1994, defendant moved for a stay of the trial pending a special action to the court of appeals. The court denied the stay and commenced the trial on August 9.

■ Continuances granted defendant for filing special actions and those resulting from defense counsel's scheduling conflicts are excluded from Rule 8 limits as delays occasioned by or on behalf of defendant under Rule 8.4(a). *See, e.g., State v. Rodriguez,* 186 Ariz. 240, 245, 921 P.2d 643, 648 (1996). This leaves the periods of time during which the state sought to admit and defendant argued to exclude DNA evidence, during which the court had not set a trial date. A delay of over five years between arraignment and trial warrants intensely close scrutiny. The state concedes that such a delay is presumptively prejudicial, citing *Doggett v. United States,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520 (1992), where the Supreme Court deemed a delay approaching one year "unreasonable enough" to trigger judicial review.

■ We are troubled that the eventual disposition of the admissibility of DNA evidence came, not two or three months after the hearing process began, but three years later. While a significant portion of that three-year period was attributable to defendant's petitions for special action and other motions, this pretrial process is extremely lengthy. Defendant's claim that his attorney's waiver on April 23, 1991 cannot reason-

ably be construed to encompass the protracted hearings that actually followed may be facially compelling, but more compelling is defendant's compromise of this argument by never once objecting to the delay until the DNA admissibility hearings were concluded.

■ Rule 8.1(d) requires defense counsel to "advise the court of the impending expiration of time limits in the defendant's case. Failure to do so may result in sanctions...." [3] Thus, a defendant may waive speedy trial rights by not objecting to the denial of speedy trial in a timely manner. *See State v. Guerrero,* 159 Ariz. 568, 570, 769 P.2d 1014, 1016 (1989) (citing *State v. Adair,* 106 Ariz. 58, 60, 470 P.2d 671, 673 (1970)). We have held that once a defendant has let a Rule 8 speedy trial time limit pass without objection, he cannot later claim a violation that requires reversal. *Id.* at 570–71, 769 P.2d at 1016–17. Our decisions regarding a defendant's duty to assert speedy trial rights are predicated in substantial part on the concern that defendants may "wait until after the [Rule 8.2 time limit] has expired and then claim a Rule 8 violation after it is too late for the trial court to prevent the violation." *State v. Swensrud,* 168 Ariz. 21, 23, 810 P.2d 1028, 1030 (1991). Moreover, we observe that although Rule 8.2(e) warns that Rule 8 speedy trial time limits "may not be extended by stipulation or waiver," in *Guerrero* we explained that Rule 8.2(e) was intended solely to prevent voluntary waivers of speedy trial time limits in DUI prosecutions. 159 Ariz. at 570, 769 P.2d at 1016. It is therefore not applicable here.

Defendant did not file a motion to dismiss for violation of his speedy trial rights until June 16, 1994, after the evidentiary hearings were terminated on June 3, 1994, after the court had excluded all DNA evidence, and after trial had been set for June 28, 1994. Fifty-seven days elapsed between defendant's arraignment on June 12, 1989 and his scheduled pretrial conference on August 8,

---

3. In *State v. Tucker,* this court suggested that Rule 8.1(d) applies only to cases where, as here, "a pretrial motion or hearing causes a trial to

occur later than the expiration of the original Rule 8.2 time limit." 133 Ariz. at 308 n. 5, 651 P.2d at 363 n. 5.

1989, leaving thirty-three days before the running of the Rule 8.2(b) time limit. As noted, however, defendant expressly waived his speedy trial rights between August 8, 1989 and April 23, 1991. Defendant could have asserted his rights and filed a motion to dismiss any time after thirty-three days past April 23, 1991; he elected not to do so. Instead, through his attorney, he waived his rights for the purpose of the *Frye* hearings and moved to dismiss thirteen days after the *Frye* hearings concluded and twelve days before his scheduled trial date. Defendant's trial was thus scheduled to commence twenty-five days after the conclusion of the *Frye* hearings, well within the thirty-three days remaining of defendant's ninety-day Rule 8.2 limitation.

Defendant's was the test case in Pima County for the admissibility of RLFP DNA evidence. The record demonstrates that defendant was represented zealously during the *Frye* hearings in a spirited effort to preclude admission of this evidence. Defendant now requests dismissal alleging that the inordinate length of process resulted in a compromise of his rights.

In *Commonwealth v. Lanigan*, 419 Mass. 15, 641 N.E.2d 1342, 1345 (1994), the Massachusetts Supreme Judicial Court exempted delays caused by DNA admissibility hearings from the statutory speedy trial time limits because of "special circumstances" presented by the hearings, the "public interest reasons justifying the delay," and because the defendant's pursuit of his speedy trial right was not "zealous." We agree that there may be adequate public policy reasons for allowing extra time for pretrial hearings involving complex scientific evidence such as DNA.

We have earlier decided that the Rule 8 right to a speedy trial is not fundamental, but "a procedural right, 'not a shield by which the accused may avoid trial and possible punishment by taking advantage of loopholes in the law or arithmetic errors.'" *State v. Henry*, 176 Ariz. 569, 578, 863 P.2d 861, 870 (1993) (quoting *Guerrero*, 159 Ariz. at 570, 769 P.2d at 1016). Here, we find that although the period between defendant's arraignment and trial was unprecedented, defendant waived his right to object by not objecting when the violation was occurring. We further conclude that defendant and his counsel knew or should have known of defendant's right to demand a trial within Rule 8 time limits. During the undisputed waived time, the trial judge explained this right to defendant each time the court continued the trial date.

Defendant complains that his attorney was not authorized to waive the speedy trial time eventually required for the DNA evidentiary hearing because he had expressed to the court his dissatisfaction with counsel. Also, defendant asserts that he himself invoked his speedy trial rights in court on February 17, 1993, when defendant remarked to the court that "after four years, something should be done." We have held that delays agreed to by defense counsel are binding on a defendant, even if made without the defendant's consent. *See Rodriguez*, 186 Ariz. at 244, 921 P.2d at 647 (citing *State v. Zuck*, 134 Ariz. 509, 515, 658 P.2d 162, 168 (1982)); *State v. Killian*, 118 Ariz. 408, 411, 577 P.2d 259, 262 (App.1978) ("Rule 8.2 does not grant the appellant any 'fundamental right' which cannot be waived by his counsel.").

### b. *Constitutional speedy trial rights*

Neither the United States nor the Arizona Constitution requires that a trial be held within a specified time period. U.S. Const. amend. VI; Ariz. Const. art. II, § 24; *see Henry*, 176 Ariz. at 578, 863 P.2d at 870. In *Barker v. Wingo*, the Supreme Court established a test by which courts decide whether trial delay warrants reversal. 407 U.S. 514, 530–32, 92 S.Ct. 2182, 2191–93, 33 L.Ed.2d 101 (1972). The four-factor *Barker* analysis examines "(1) the length of the delay; (2) the reason for the delay; (3) whether the defendant has demanded a speedy trial; and (4) the prejudice to the defendant." *Lukezic*, 143 Ariz. at 69, 691 P.2d at 1097 (citing *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192). In weighing these factors, the length of the delay is the least important, while the preju-

dice to defendant is the most significant. *See Henry*, 176 Ariz. at 579, 863 P.2d at 871. We apply each of the *Barker* factors to the facts presented here.

▮▮▮ A pretrial period after arraignment of over five years is presumptively prejudicial. *See Doggett*, 505 U.S. at 652 n. 1, 112 S.Ct. at 2691 n. 1. This factor, however, must be considered in concert with the remaining three *Barker* factors. Not surprisingly, defendant attributes the reason for the delay primarily to the state's desire to present DNA evidence. In fact, the evidentiary hearings were required when defendant moved to exclude this evidence. We agree with the state that it would be unjust to allow defendant to force exclusion of potentially probative evidence where its admission provides a court with an issue of first impression and requires a lengthy evidentiary hearing. Where, as here, a defendant fights to exclude DNA evidence, the delay resulting from hearings necessary to determine admissibility is necessarily attributable to the defense. *See State v. Weeks*, 270 Mont. 63, 891 P.2d 477, 483 (1995). Obviously, we conclude that a defendant may contest the admissibility of scientific evidence but not that he may do so and then later contend violation of speedy trial rights due to delays occasioned by the contest. In so stating, we do not seek to penalize the defendant but merely to accommodate his wishes without jeopardizing the state's interest in bringing the matter to trial.

Here, defendant waived his speedy trial rights in advance of the hearings and, for reasons the record does not reveal, never objected to the court that his rights had been compromised by the long delay. Thus, we find that the reason for the delay weighs against defendant's position. Defendant did not move to dismiss for violation of speedy trial rights until after the DNA evidentiary hearing process had run its three-year course. His assertion of rights was thus untimely and bears little weight in our *Barker* analysis. Furthermore, defendant did not complain of any violation of speedy trial rights until twelve days before trial, and the next day he moved to continue the trial because of defense counsel's scheduling conflict.

Finally, defendant claims no prejudice from the trial delay other than that arising out of his long period of custody. While five years in custody may have increased defendant's anxiety quotient, we find, on the entire record, that the delay did not prejudice his ability to defend against the state's claims. After weighing each of the *Barker* factors, we conclude that defendant's constitutional right to an expeditious trial has not been unduly disturbed.

Although we reject defendant's claim of speedy trial violations, any pretrial delay stretching into a period of years greatly concerns us. Thus, we issue the following word of caution. The duty to move criminal cases through the courts is a responsibility shared by the prosecution, the defense, and the courts. *See* Rule 8.1(a) and cmt. to Rule 8.1(d), Ariz. R.Crim. P; *United States v. Perez–Reveles*, 715 F.2d 1348, 1353 (9th Cir. 1983). Our holding in this case is limited to the facts peculiar to this record. We find no abuse of discretion by the trial court in granting continuances and in allowing delays in pretrial hearings because of the novelty of DNA evidence and the absence of prejudice. We also recognize that defendants make intelligent decisions to waive speedy trial time limits and that in certain circumstances there are sound tactical reasons to do so.

### 2. Gruesome Photographs

▮▮▮ Defendant argues that the trial court erred in admitting several autopsy photographs of the victim. The photographs depict the corpse as it appeared after decomposing in the desert for over three days in temperatures exceeding 100°F. The corpse is severely discolored, and in all of the photographs insects are shown partly covering the body. This insect activity is vividly apparent in the close-ups. Perhaps the most disturbing photograph, marked Exhibit 156, depicts the victim's face staring at the camera in a mummy-like mask of death.

■ Defendant asserts that under Rule 403 of the Arizona Rules of Evidence, these photographs were improperly admitted because their probative value was outweighed by the danger that they would prejudice the jury against him.[4] This court has frequently confronted claims that photographs admitted at trial were so graphic that their probative value was outweighed by the prejudice they create. Recently, this court declared that admissibility of photographs at trial will be determined under a three-part inquiry in which a court examines the relevance of the photograph, the "tendency [of the photograph] to incite or inflame the jury," and the "probative value versus potential to cause unfair prejudice." *State v. Murray,* 184 Ariz. 9, 28, 906 P.2d 542, 561 (1995) (citing *State v. Stokley,* 182 Ariz. 505, 515, 898 P.2d 454, 464 (1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 787, 133 L.Ed.2d 737 (1996), and Ariz. R. Evid. 401 to 403), *cert. denied,* 518 U.S. 1010, 116 S.Ct. 2535, 135 L.Ed.2d 1057, and — U.S. ——, 117 S.Ct. 193, 136 L.Ed.2d 130 (1996). The relevance of questionable photographs depends on whether they assist a jury to understand an issue. *See State v. Roscoe,* 184 Ariz. 484, 494, 910 P.2d 635, 645 (citing *Murray,* 184 Ariz. at 28, 906 P.2d at 561), *cert. denied,* — U.S. ——, 117 S.Ct. 150, 136 L.Ed.2d 96 (1996).

■ To find that the autopsy photographs of Ms. Reid were improperly admitted, this court must find a clear abuse of discretion by the trial court. *See State v. Gulbrandson,* 184 Ariz. 46, 60, 906 P.2d 579, 593 (1995) (citing *State v. Amaya–Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990)). Trial courts are permitted broad discretion in admitting photographs. For example, in *State v. Bracy,* the court upheld the admission of graphic and inflammatory photo-

graphs of victims at the murder scene. The court reasoned that "we cannot compel the state 'to try its case in a sterile setting.'" 145 Ariz. 520, 534, 703 P.2d 464, 478 (1985) (quoting *State v. Chapple,* 135 Ariz. 281, 289–90, 660 P.2d 1208, 1216–17 (1983)); *see also Amaya–Ruiz,* 166 Ariz. at 171, 800 P.2d at 1279 ("In prosecuting [a murder], the state must be allowed some latitude to show what actually occurred."). Photographs of a corpse in a murder trial may properly be admitted in evidence for many reasons, including

> to prove the corpus delecti, to identify the victim, to show the nature and location of the fatal injury, to help determine the degree or atrociousness of the crime, to corroborate state witnesses, to illustrate or explain testimony, and to corroborate the state's theory of how and why the homicide was committed.

*State v. Chapple,* 135 Ariz. at 288, 660 P.2d at 1215 (citing *State v. Thomas,* 110 Ariz. 120, 130, 515 P.2d 865, 875 (1973)). In a case involving a challenge to the admission of an inflammatory photograph of a close-up of the victim's torso and decomposed head, the court declared the evidence admissible "provided it has probative value apart from merely illustrating the atrociousness of the crime." [5] *State v. Poland,* 144 Ariz. 388, 401, 698 P.2d 183, 196 (1985) (citing *State v. Perea,* 142 Ariz. 352, 690 P.2d 71, 76 (1984), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986)). However, this court has declared that it will reverse on appeal if "gruesome evidence is admitted for the *sole purpose* of inflaming the jury." *State v. Gerlaugh,* 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982) (citing *State v. Steele,* 120 Ariz. 462, 586 P.2d 1274 (1978)) (emphasis added).

Applying the three-part test for admissibility of the photographs, we first decide

---

4. Rule 403 requires that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

5. In *Poland,* the probative value of the photograph was in the fact that the victim could be

identified partly by the uniform he had been wearing in the photograph, that the photograph helped to establish that the medical examiner had difficulty in determining a cause of death, and that the victim's stopped watch was visible, aiding the investigation to deduce the time of the murder. *State v. Poland,* 144 Ariz. 388, 401, 698 P.2d 183, 196 (1985).

that these photographs were relevant. As stated in *Chapple*, "any photograph of the deceased in any murder case [is relevant to assist a jury to understand an issue] because the fact and cause of death are always relevant in a murder prosecution." 135 Ariz. at 288, 660 P.2d at 1215. Conversely, we have no difficulty deciding that the photographs are prejudicial. They were unduly disturbing because of their gruesome character and tended to incite or inflame the jury because of the severe state of the victim's decomposition and the accompanying insect activity.

The medical examiner testified clearly about wounds to the victim's body, and we conclude that the photographs provide little or no additional aid in that regard. Further, the examiner did not testify specifically regarding two of the most unsettling of the autopsy photographs, Exhibits 150 and 156. Accordingly, we conclude that the trial court abused its discretion, erring on the side of relevance, by not excluding the autopsy photographs because the resultant danger of unfair prejudicial effect on the jury substantially outweighed the photographs' probative value.

 Defendant argues, of course, that because the trial court erred in admitting the photographs, he did not receive a fair trial under the federal and state constitutions and that this court must remand for a new trial. We disagree because even if the trial court abused its discretion in admitting the photographs, we need not reverse or remand if this error was harmless. *See State v. Moorman*, 154 Ariz. 578, 586, 744 P.2d 679, 687 (1987). In *State v. Atwood*, we reiterated that the test for harmless error depends on whether there is a "reasonable probability" that had the error not been made, the verdict would have been different. 171 Ariz. 576, 639, 832 P.2d 593, 656 (1992) (quoting *State v. Williams*, 133 Ariz. 220, 225, 650 P.2d 1202, 1207 (1982)) (quoting *State v. McVay*, 127 Ariz. 450, 453, 622 P.2d 9, 12 (1980)). "Error ... is harmless if we can say, beyond a reasonable doubt, that the error did not contribute to or affect the verdict." *State v.*

*Bible*, 175 Ariz. at 588, 858 P.2d at 1191 (citing *State v. Lundstrom*, 161 Ariz. 141, 150 & n. 11, 776 P.2d 1067, 1076 & n. 11 (1989)). While it is impossible to assess the precise effect viewing the most gruesome autopsy photographs might have had on the jury, we have no difficulty concluding beyond a reasonable doubt by reason of the overwhelming evidence against the defendant, including, most importantly, his own uncoerced confession, that the jury would have found him guilty without the photographs. We thus find the trial court's discretionary error in admitting the autopsy photographs harmless.

### 3. Illegal detention

The Tucson Police stopped defendant at approximately 1:45 a.m. in downtown Tucson because his car was losing oil and emitting smoke. After officers noticed that parts of defendant's body were smeared with blood and feces, they questioned him about his appearance and eventually asked him to take them to the scene of the alleged fight. Defendant voluntarily complied. Eventually, the police photographed defendant with his permission. The detention lasted approximately forty-five minutes, after which the police issued defendant a motor vehicle repair order and released him. Defendant's statements and the photographs were used against him at trial.

Defendant argues that his questioning by police officers in the early morning hours of May 19, 1989, constituted an illegal detention and that the trial court erred in denying his motion to suppress evidence gathered during the detention. Under these circumstances, defendant argues, he should have been given *Miranda* warnings. Because he received no warning, he alleges that use at trial of statements made during the detention violated his rights under the Fifth and Fourteenth Amendments of the United States Constitution and Article II, section 24 of the Arizona Constitution.

 When police officers conduct an investigation, they may detain persons "under circumstances which would not justify an

arrest." *State v. Aguirre,* 130 Ariz. 54, 56, 633 P.2d 1047, 1049 (App.1981). In *State v. Wiley,* this court instructed that a police officer may detain a person for investigative purposes if the officer has a "reasonable, articulable suspicion that a particular person had committed, was committing, or was about to commit a crime." 144 Ariz. 525, 530, 698 P.2d 1244, 1249 (1985), *overruled on other grounds,* 157 Ariz. 541, 760 P.2d 541 (1988). Here, Officer Batista was justified in initially stopping defendant on the basis of the leaking oil and excessive smoke from his car. When the officer also discovered that defendant's arms and legs were smeared with blood, it was reasonable for him to investigate the cause. *See State v. Brierly,* 109 Ariz. 310, 316, 509 P.2d 203, 209 (1973) (finding police search of truck reasonable when, after stopping truck for malfunctioning headlight, police noticed driver had blood on his chest, arms, hands, and face); *Patton v. United States,* 633 A.2d 800, 814–15 (D.C.App.1993) (defendant, bleeding from a cut, flagged down police, who transported him to crime scene, then to hospital, and later to police station where they interrogated him with his consent; court held that police actions would "not exceed the bounds of a permissible *Terry* stop.").

■ A detention of nearly forty-five minutes merits scrutiny. During this period, defendant was questioned about his appearance and condition, accompanied Officer Batista to the supposed fight scene to search for the alleged co-participant, and finding nothing, returned to his car where police photographed him with his consent. Finding no probable cause to arrest defendant, the police issued a repair order, and defendant left. At no time did the officers handcuff defendant or advise him that he was under suspicion or arrest. Defendant voluntarily cooperated in all of the activities. The police had reasonable suspicion to investigate defendant's appearance and the story he told to explain it, and did not exceed the scope of that investigation. The forty-five minute duration was fully justified, given the time to travel in search of the "fight scene," to return, and to photograph defendant.

■ If defendant's detention by the police amounted to custody, the police would have been required to inform him of his *Miranda* rights before commencing an interrogation. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The test used to determine if a person is in custody under a Fifth Amendment analysis is whether the person's freedom of movement is restricted to the extent it would be tantamount to formal arrest. *See Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (holding that "comparatively nonthreatening character of detentions [associated with ordinary traffic stops] explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda* "); *California v. Beheler,* 463 U.S. 1121, 1123, 1125, 103 S.Ct. 3517, 3519, 3520, 77 L.Ed.2d 1275 (1983) (per curiam) (defendant was "neither taken into custody nor significantly deprived of his freedom of action" even though he accompanied police to station where he was questioned); *State v. Castellano,* 162 Ariz. 461, 462–63, 784 P.2d 287, 288–89 (1989) (under totality of circumstances, including fact that noncoercive interrogation took place on public highway, questioning of defendant after traffic stop was not custodial); *State v. Stabler,* 162 Ariz. 370, 375, 783 P.2d 816, 821 (App.1989) (defendant was subject of traffic stop, police advised him that he was not free to go and questioned him; nevertheless, court found that defendant was not in custody and thus *Miranda* rights did not apply).

Defendant argues that he was not free to leave after the initial traffic stop and states that he was, in fact, in custody. In support of his claim, defendant emphasizes that he was interrogated at length, transported to and from the alleged fight scene in a police car and photographed, and that the detention lasted forty-five minutes. In *Berkemer,* the Supreme Court warned that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*" 468 U.S. at 440, 104 S.Ct. at 3150.

In this case, the interrogation and detention were noncoercive and driven in part by concern both for defendant and the unidentified participant of the alleged fight. Moreover, on this record, defendant's interaction with the police was entirely cooperative. The length of the detention seems unusual but appears to have been no more than that necessary to accomplish a reasonable investigation of the unusual circumstances the officers encountered. To overturn the trial court's denial of defendant's motion to suppress requires that defendant prove clear and manifest error. *See State v. Stanley,* 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991); *State v. Harris,* 131 Ariz. 488, 490, 642 P.2d 485, 487 (App.1982). We find that the facts presented here do not support a finding of clear and manifest error.

Additionally, defendant's argument to suppress evidence gathered during the detention seems pointless because the most damaging evidence resulting from the stop and detention was defendant's soiled condition and general appearance. This is nontestimonial evidence the officers observed in plain view. Such evidence would have been admissible even if defendant had been in custody and had not been given his *Miranda* warning. *See State v. Lee,* 184 Ariz. 230, 233, 908 P.2d 44, 47 (App.1995).

### 4. Illegal arrest

Defendant, claiming his arrest was illegal, asks the court to find that the trial judge erred in denying the motion to suppress evidence thus obtained. The basis for the alleged illegality is that the officers initially told defendant he was being arrested on outstanding warrants for traffic citations when in reality they sought custody to interrogate defendant on the homicide. Thus, defendant argues, the arrest was illegal because it was merely a pretext.

The argument and accompanying analysis are without merit. The case on which defendant primarily relies, *Taglavore v. United States,* 291 F.2d 262 (9th Cir.1961), is not dispositive of the facts here. The warrant at issue in *Taglavore* was not preexisting, but rather stemmed from a traffic citation issued by a drug inspector on the basis of violations observed by the inspector the day before he made the defendant's arrest for a suspected drug offense. *Id.* Both federal and Arizona case law clearly allow police to use valid, preexisting traffic warrants to effect an arrest, even if the arrest is made to investigate other suspected crimes. In *State v. Jeney,* the court of appeals pointed out that the United States Supreme Court's Fourth Amendment analysis focuses on " 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time.' " 163 Ariz. 293, 295, 787 P.2d 1089, 1091 (App.1989) (quoting *Maryland v. Macon,* 472 U.S. 463, 471, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985)); *see also Whren v. United States,* —— .U.S. ——, ——, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996) (eliminating pretext defense and holding that "subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Citing various state court decisions, the *Jeney* court reasoned that "[m]ost state courts have now adopted the view that so long as the police do no more than they are objectively authorized and legally permitted to do, their motives in making an arrest are irrelevant and not subject to inquiry." 163 Ariz. at 296, 787 P.2d at 1092. The *Jeney* court expressly endorsed the objective test for determining the reasonableness of an officer's search. *Id.*

Under the facts presented here, the traffic warrants relied on by the arresting officers were valid, and, as was the case in *Jeney,* "[r]egardless of the officer's subjective intent, they had an objectively valid reason to make the arrest. There is no suggestion that the traffic warrants were held or issued for any purpose other than their execution for a traffic offense." *Id.* That police could have arrested defendant on the basis of the search warrant expressly permitting them to seize defendant for the purpose of taking hair and blood samples provides further support for the state's position.

### 5. Illegal search warrant

Defendant contends that the police provided false or misleading statements to the judge as the basis for issuance of the search warrant for defendant's house just after midnight on May 25, 1989. He asserts that the trial court erred when it found only one of the affiant's statements to be false and concluding that the affidavit provided sufficient probable cause to support the search warrant.

■ For evidence thus seized to be ruled inadmissible, a defendant must prove by a preponderance of the evidence that the affiant's statement to the judge was knowingly or intentionally false or was made in reckless disregard for the truth, and that the false statement was necessary to a finding of probable cause. *See Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978); *State v. Buccini,* 167 Ariz. 550, 554, 810 P.2d 178, 182 (1991). To overturn a trial court's ruling on a defendant's motion to suppress, this court must find the trial court committed clear and manifest error. *See State v. Gulbrandson,* 184 Ariz. 46, 57, 906 P.2d 579, 590 (1995) (citing *State v. Stanley,* 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991), *cert. denied,* 518 U.S. 1022, 116 S.Ct. 2558, 135 L.Ed.2d 1076 (1996)).

■ Even if we consider nothing but defendant's version of how he came to be soiled, along with undisputed statements by the affiant, we are left with the following information. Defendant, covered with blood and feces, was stopped during the early morning hours not long after, and not far from, the place where the victim was last seen. Defendant's explanation for his condition—that he had been in a fight nearby, where he had also damaged his car—was immediately investigated by police, who found no corroborating evidence. The victim's pants, found near her body, were smeared inside and out with feces. Two bloodied rocks were found near the victim. The victim's body appeared to have been dragged from where she was stripped and assaulted to where her body was found. The officer who stopped defendant for the traffic violation had seen defendant less than two hours earlier, wearing the clothing he wore when he was stopped, except that when first observed, neither defendant nor his clothing had been soiled, and he had worn a pair of jeans. When Officer Batista later stopped defendant for the traffic violation, defendant wore only the spandex shorts, but no jeans. When the officer earlier observed defendant, his car had not been smoking, but less than two hours later it was smoking heavily.

On these facts, we conclude that defendant has failed to show that the trial court committed clear and manifest error in denying his motion to suppress evidence obtained pursuant to the search warrant.

### 6. Habit Evidence

We also reject defendant's argument that the trial court erred in admitting testimony regarding the victim's "habit" of never accepting rides from strangers and seldom accepting rides from friends. Defendant complains that by admitting this evidence he was denied a fair trial under the Fourteenth Amendment of the United States Constitution and article II, section 24 of the Arizona Constitution.

■ This court "will not consider an evidentiary theory when it is advanced for the first time on appeal." *State v. Bolton,* 182 Ariz. 290, 304, 896 P.2d 830, 844 (1995) (citing *State v. Schaaf,* 169 Ariz. 323, 332, 819 P.2d 909, 918 (1991)). At trial, defendant failed to raise objections on constitutional grounds. This court may therefore properly decline to consider defendant's constitutional claims. We observe simply that Rule 406 of the Arizona Rules of Evidence states:

> [e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or the organization on a particular occasion was in conformity with the habit or routine practice.

Arizona courts have held that habit evidence is of a "semi-automatic and regular character." *State v. Munguia,* 137 Ariz. 69, 72, 668 P.2d 912, 915 (App.1983); *see also State v. Serna,* 163 Ariz. 260, 266, 787 P.2d 1056, 1062 (1990). Courts have taken pains to distinguish between habit evidence indicating a person's "regular response to a repeated specific situation" and evidence introduced to show character, generally describing one's predisposition. *Boswell v. Phoenix Newspapers, Inc.,* 152 Ariz. 1, 4, 730 P.2d 178, 181 (App.1985) (citing McCormick, *Law of Evidence* § 162 (1954) and 2 Wigmore, *Evidence* § 375 (1979)), *approved as supplemented,* 152 Ariz. 9, 730 P.2d 186 (1986). This court has held that evidence that an employer warned an employee against speeding suggested that the employee habitually drove rapidly between jobs. *State v. Walden,* 183 Ariz. 595, 613, 905 P.2d 974, 992 (1995), *cert. denied,* 517 U.S. 1146, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996). In *Boswell,* we ruled that evidence a reporter always obtained the correct spelling of names at the start of an interview was admissible to show that she had obtained the correct spelling of names of interviewees in a specific instance. 152 Ariz. at 4, 730 P.2d at 181.

█ Habit evidence is admissible, while character evidence is usually not. *See Boswell,* 152 Ariz. at 4, 730 P.2d at 181; Rule 404, Ariz. R. Evid. Our standard of review is that "[a]bsent a clear abuse of discretion" this court will not "second-guess a trial court's ruling on the admissibility or relevance of evidence." *State v. Rodriguez,* 186 Ariz. 240, 250, 921 P.2d 643, 653 (1996) (citing *Amaya–Ruiz,* 166 Ariz. at 167, 800 P.2d at 1275).

█ The state argues that the trial court's admission of evidence of the victim's habit of rarely accepting rides was probative to show that on the night of her murder she would not have willingly accompanied defendant in his car, as he claimed, and that instead she was kidnapped. Witnesses testified variously that the victim never took rides, that of twenty-five to thirty offers of rides from acquaintances, the victim accepted ten to fifteen percent, that of "very frequent" offers, she would "most often" decline, and that of twenty to forty offers, she accepted none.

The trial court did not abuse its discretion in determining that this was habit evidence. The cases cited by defendant to support exclusion of the disputed evidence did not involve parties acting *in response* to a specific, repeated situation. *See Munguia,* 137 Ariz. at 72, 668 P.2d at 915 (where evidence that victim frequently "bummed" drinks was inadmissible as habit); *State v. Williams,* 141 Ariz. 127, 130, 685 P.2d 764, 767 (App.1984) (testimony that victim normally carried gun when intoxicated was held inadmissible). In this case, the state introduced ample evidence to show that the victim's "semi-automatic" and "regular" response to specific, repeated offers of a ride was to refuse. We find no error.

### 7. Ineffective Assistance of Counsel

Defendant claims that he was denied effective assistance of counsel in violation of the Sixth Amendment when trial counsel admitted guilt in front of the jury in the opening statement. By so doing, defendant asserts that his counsel in effect abandoned all defenses. Defendant asks this court to remand for a new trial.

█ This court will not "resolve an ineffective assistance of counsel claim on direct appeal unless the record clearly indicates that the claim is meritless." *State v. Maturana,* 180 Ariz. 126, 133, 882 P.2d 933, 940 (1994) (citing *State v. Atwood,* 171 Ariz. at 599, 832 P.2d at 616). We find this claim entirely without merit and decide the issue against defendant.

█ Defendant's argument incorrectly states that by admitting defendant's responsibility for the victim's death, his trial counsel abandoned all defenses. Counsel had no choice but to face facts established by defendant's own conduct and statements. Defendant had confessed causing the victim's

death. The state possessed contemporaneous photographs of defendant covered in blood and feces. While defendant suggests that "effective representation requires that counsel pursue all available defenses," citing *State v. Schultz*, 140 Ariz. 222, 681 P.2d 374 (1984), this court has determined that "defense counsel·is not required to argue the absurd or impossible." *State v. Roscoe*, 145 Ariz. 212, 225, 700 P.2d 1312, 1325 (1984). It was strategically sound for defense counsel to admit defendant's "responsibility" for the victim's death, but to argue that under the law defendant was guilty of only manslaughter or second degree murder. Rather than abandoning all defenses, defense counsel argued against a finding of kidnapping and sexual assault in an effort to forestall a verdict of felony murder. Although defense counsel was unsuccessful in this attempt, his representation of defendant during the opening statement satisfied the essential prerequisites of effective assistance. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Walton*, 159 Ariz. 571, 591–92, 769 P.2d 1017, 1037–38 (1989), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

### B. Sentencing Issues

#### 1. Independent review

We have performed a detailed independent review of defendant's death sentence, as required by law. A.R.S. § 13–703.01. In conducting this review, we have examined the entire record to weigh and consider the aggravating and mitigating circumstances as set forth in A.R.S. sections 13–703(F) and (G). Our review confirms the trial court's finding beyond a reasonable doubt that the aggravating factor of commission of the murder in an especially cruel manner under section 13–703(F)(6) was present and that the mitigating factor of immaturity under section 13–703(G)(5) was also present. In addition, several nonstatutory mitigating factors were found to exist.

#### 2. Aggravating factor of especially cruel circumstances

■ A court will not impose the death penalty unless it finds at least one aggravating circumstance under A.R.S. section 13–703(F) beyond a reasonable doubt. *See State v. Brewer*, 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992). Here, the state argued and the court found as one aggravating circumstance that defendant murdered Ms. Reid in an especially cruel manner. A.R.S. § 13–703(F)(6). Defendant challenges the court's finding.

■ A finding of cruelty is warranted when the defendant inflicts on the victim mental anguish or physical abuse before the victim's death. *State v. Murray*, 184 Ariz. 9, 37, 906 P.2d 542, 570 (1995) (quoting *State v. Walton*, 159 Ariz. 571, 586, 769 P.2d 1017, 1032 (1989)), *aff'd*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Such a finding depends on the sensations and anxieties experienced by the victim. *Id.* A finding of mental anguish depends on whether a victim "experiences significant uncertainty as to [her] ultimate fate." *Id.* (citing *Brewer*, 170 Ariz. at 501, 826 P.2d at 798). Cruelty is found when the "victim [is] conscious at the time of the offense in order to suffer pain and distress. When evidence of consciousness is inconclusive, a finding of cruelty is unsupported." *Amaya–Ruiz*, 166 Ariz. at 177, 800 P.2d at 1285 (citations omitted).

■ In its special verdict, the sentencing court found that the victim suffered tremendous mental and physical pain when she was forced into defendant's car trunk and transported to the desert where she was beaten, sexually assaulted, and eventually murdered. Defendant did not confess to kidnapping the victim, but did admit to beating her as she fought back, removing her clothes, having intercourse with her, and smashing her in the head with a rock when she would not stop yelling. The court's finding of the victim's abduction depended primarily on evidence of blood compatible with the victim (and not defendant) in the trunk of defendant's car. Physical evidence at the scene corroborated defendant's confession. The victim's clothing, including her torn brassiere, was strewn in one area of the murder scene. Photographs of the area vividly de-

pict drag marks running from this area to the spot where the victim and the bloody rocks were found. The court also considered significant to its finding of mental anguish that the victim defecated in and on her clothing.

Because the medical examiner testifying at trial did not state definitively that the lethal blow to the victim's head occurred after her other injuries, defendant argues that there is no evidence that the victim suffered prior to death. Defendant urges this court to find that, under the evidence admitted at trial, the possibility that the victim was rendered unconscious before suffering any other injuries is as plausible as the scenario argued by the state. Defendant suggests that without proof of the victim's conscious suffering, the court erred in finding the aggravating factor of cruelty.

To avoid a finding of physical pain and mental anguish, defendant suggests a scenario under which the victim was rendered unconscious before suffering any of her other injuries, including broken ribs, a broken jaw, and internal injuries. Further, defendant asserts that this scenario is equally plausible to the sequence of events promoted by the state. Defendant's confession and physical evidence at the scene fully discredit his version of the events. We agree with the state that it strains reason to suppose that defendant, using two rocks, first knocked the victim senseless with fatal blows to the head, after which her unconscious body was stripped naked, beaten thoroughly, raped, and dragged to its final resting place. Under this scenario, defendant must have carried the bloody rocks along and placed them next to the victim's body. Ironically, if this court were to accept defendant's "equally plausible" hypothesis, it would most certainly then find the (F)(6) aggravating factor of depravity. Moreover, defendant ignores his own admission that he beat her *as she fought back* and hit her with the rock *when she would not stop yelling*. This is clear evidence of conscious suffering.

We find defendant's version of events is not "equally [as] plausible" as the version accepted by the sentencing court. The reasonable version is that provided by defendant's confession and physical evidence at the scene: defendant beat and raped the victim in a brutal assault that lasted many minutes before he crushed her skull. The court did not err in finding the murder to be especially cruel beyond a reasonable doubt.

### 3. Mitigating circumstances

Defendant does not appeal the findings of the sentencing judge concerning mitigating circumstances. We have independently reviewed the record for all mitigating circumstances in order to determine whether the trial judge properly sentenced defendant to death. *See State v. Jones*, 185 Ariz. 471, 492, 917 P.2d 200, 221 (1996) (citing A.R.S. § 13–703.01; *Gulbrandson*, 184 Ariz. at 67, 906 P.2d at 600). In our review, we have been mindful that the sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether the death penalty should be imposed." *State v. Kiles*, 175 Ariz. 358, 373, 857 P.2d 1212, 1227 (1993) (internal quotations omitted). We further note that the weight accorded such evidence is within the sentencing judge's discretion, *State v. Ramirez*, 178 Ariz. 116, 131, 871 P.2d 237, 252 (1994), and that a defendant must prove the existence of any mitigating circumstance by a preponderance of the evidence. *See State v. West*, 176 Ariz. 432, 449, 862 P.2d 192, 209 (1993).

At sentencing, defendant argued as statutory and nonstatutory mitigating factors: (1) his dysfunctional family life and lack of socialization; (2) a history of alcohol and drug abuse; (3) his expressions of remorse; (4) his impaired capacity to appreciate the wrongfulness of his conduct, A.R.S. § 13–703(G)(1); (5) his good behavior while incarcerated; (6) his lack of adult convictions; (7) no prior record of violent tendencies; and (8) his age at the time of the murder, A.R.S. § 13–703(G)(5). The sentencing judge found as a mitigating circumstance that defendant was raised in a sub-normal home and had endured a disruptive middle childhood. The

judge concluded, however, that defendant's longstanding history of substance abuse was not a mitigating circumstance that significantly impaired his ability to recognize the wrongfulness of his actions when he took Ms. Reid's life.

Similarly, the judge was not persuaded that defendant had shown by a preponderance of the evidence that defendant suffered from any emotional disorder impairing his ability to recognize the wrongfulness of his actions. The judge acknowledged defendant's emotional growth and personal improvement during incarceration. The judge did not find defendant's age of twenty-two to be mitigating but decided that defendant's emotional immaturity was inconsequential in the circumstances of this case. Although the judge found that defendant had no history of felonies and no history of propensity for acts of violence, he refused, in light of the murder, to conclude that defendant posed no risk of future danger.

After weighing the mitigating circumstances both individually and cumulatively against the aggravating circumstance, the trial judge concluded the aggravator of especial cruelty outweighed all other circumstances and sentenced defendant to death.

█ In our independent reweighing of the aggravating and mitigating circumstances, we find the record provides no basis on which to alter the sentencing judge's decision. We note that defendant argues that because the sentencing judge did not specifically discuss the issue of remorse in his special verdict, the judge did not consider remorse in weighing the aggravating and mitigating circumstances, thus violating defendant's rights under the Eighth and Fourteenth Amendments of the U.S. Constitution and under article II, sections 1, 4, 15, and 24 of the Arizona Constitution. Defendant's argument lacks merit. We have held that a special verdict is not defective because it "does not discuss all the circumstances argued by the defense to be mitigating." *State v. Apelt (Michael)*, 176 Ariz. 349, 368, 861 P.2d 634, 653 (1993) (citing *State v. McCall*,

160 Ariz. 119, 125, 770 P.2d 1165, 1171 (1989)). The record clearly indicates that (1) defendant provided evidence of remorse in his sentencing memorandum, (2) the state rebutted such evidence, and (3) defendant told the judge at his sentencing hearing he was sorry for killing the victim. The judge issued the sentence a brief time later that day. We have no reason to doubt that the sentencing judge weighed defendant's remorse in his balancing of mitigating and aggravating circumstances.

Additionally, we have expressly considered evidence of defendant's remorse in our review and reweighing of the aggravating and mitigating factors. We have no need to remand to the trial court for resentencing because we find no error in the trial court's exclusion of mitigating evidence or in not reflecting adequately the evidence presented. *See* A.R.S. § 13–703.01(C).

We agree with the sentencing judge that defendant's upbringing was subnormal. The record supports the judge's conclusion that defendant's home life was sadly lacking and that his mother's erratic behavior toward defendant inhibited his emotional development and social skills. We also find significant the conclusions of the psychologist testifying on defendant's behalf at the sentencing hearing, who stated that defendant "did not suffer acute, dramatic abuse." Although we recognize defendant's upbringing as a mitigating circumstance, we accord it little weight. While defendant's inadequate upbringing may have contributed to his emotional immaturity and undeveloped humanitarian skills, we concur with defendant's statement at his sentencing hearing that "people that have had as bad a background or worse haven't killed. And I don't want what everyone has said about my background to be an excuse for what's happened."

The record demonstrates defendant's longtime substance abuse problems. We note, however, that defendant's general problems with substance abuse are not essential to our decision here. We therefore decline to conclude that defendant was impaired by alcohol

consumption to an extent that it interfered with his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." A.R.S. § 13–703(G)(1); *see also State v. Medrano*, 185 Ariz. 192, 194, 914 P.2d 225, 227 (1996) (citing *Stokley*, 182 Ariz. at 520, 898 P.2d at 469).

As discussed earlier, we find that defendant expressed remorse for the victim's death on more than one occasion. At his sentencing hearing, defendant said, "I'm sorry for putting everyone in this situation, I am sorry to the family for causing this death of Ms. Reid." To a presentence investigator, defendant remarked, "A lady died, that really sucks. It was senseless that she died." In his November 17, 1994 typed letter to the sentencing judge, defendant declared,

> I should be held accountable.... Knowing I was the cause of Ms. Reid's death is something I will have to live with. Believe me, it's not an easy thing that I can just forget about. It does not matter that I am locked up. Even if I was free I would still think about her and know if it wasn't for me, she would be alive today.

At the bottom of this letter, defendant added in his own hand, "I am truly sorry I have caused Ms. Reid's death, Your Honor."

We recognize remorse as a nonstatutory mitigating factor. *See Brewer*, 170 Ariz. at 507, 826 P.2d at 804; *see also State v. Gallegos*, 185 Ariz. 340, 345–46, 916 P.2d 1056, 1061–62 (1996); *State v. Gallegos*, 178 Ariz. 1, 19, 870 P.2d 1097, 1115 (1994); *State v. Wallace*, 151 Ariz. 362, 364–65, 728 P.2d 232, 234–35 (1986). We find that since his arrest, defendant has demonstrated remorse and accepted responsibility for Ms. Reid's murder. However, defendant's remorse for his actions does little to counterbalance especial cruelty as a serious aggravating circumstance in Ms. Reid's murder. According to defendant's confession, when he left Ms. Reid in the desert early the morning of May 19, 1989, he did not know whether she was alive or dead. He confessed that he rode his bicycle out to the murder site several days later to see if

her body was still there, hoping that it would not be, that she was still alive. We would find defendant's remorse a more compelling mitigating factor if, for example, it had prompted him to report his actions toward Ms. Reid to the authorities.

The sentencing judge found that defendant's ability to appreciate the wrongfulness of his conduct was not impaired on the night of the murder to any significant extent by substance abuse, emotional disorders, situational stress, or by a combination of these. Our review of the record convinces us that the trial court's finding was proper. In fact, Dr. Flynn, the forensic psychologist who testified for defendant at the sentencing hearing, advised the court that defendant did not suffer from an emotional disorder or any cognitive disorder affecting his ability to distinguish right from wrong or to conform his behavior to the law.

The sentencing judge also acknowledged that defendant had experienced personal growth in prison and had caused no problems, without specifically finding this to be a mitigating factor. This court has previously rejected pretrial and presentence good behavior during incarceration as a mitigating circumstance. *See Stokley*, 182 Ariz. at 524, 898 P.2d at 473 (citing *State v. Lopez*, 175 Ariz. 407, 416, 857 P.2d 1261, 1270 (1993)). As we indicated in *Lopez*, a "defendant would be expected to behave himself in county jail while awaiting [sentencing]." 175 Ariz. at 416, 857 P.2d at 1270. Thus, we decline to find defendant's good behavior while in the Pima County Jail a mitigating factor.

We agree that the record supports the sentencing judge's findings that defendant had no previous adult felony convictions, no prior record of acts of violence, and that defendant is capable of rehabilitation. We also find that the sentencing judge correctly rejected defendant's age of twenty-two as a mitigating circumstance and properly found that his emotional immaturity was not a significant mitigating factor.

After examining the entire record and reweighing the applicable aggravating and mit-

igating factors, we find that the aggravating circumstance of especial cruelty in defendant's murder of Ruby Reid outweighs all factors mitigating in favor of leniency.

## C. Other Issues

Defendant makes a number of additional arguments to preserve them for future appeal, although each has previously been considered and rejected by this court.

The death penalty is per se cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *See Gulbrandson,* 184 Ariz. at 72–73, 906 P.2d at 605–06.

Execution by lethal injection is cruel and unusual punishment. *See State v. Spears,* 184 Ariz. 277, 291, 908 P.2d 1062, 1076 (1996).

Arizona's death penalty statute is unconstitutional because it requires the death penalty whenever an aggravating circumstance and no mitigating circumstances are found. *See State v. Bolton,* 182 Ariz. 290, 310, 896 P.2d 830, 850 (1995).

Arizona's death penalty statute is unconstitutional because the defendant does not have the right to death-qualify the sentencing judge. *See Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

Arizona's death penalty statute fails to provide guidance to the sentencing court. *See Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

Arizona's death penalty statute violates the Eighth Amendment by requiring defendants to prove that their lives should be spared. *See Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

Arizona's death penalty statute violates the Eighth and Fourteenth Amendments and article II, sections 4 and 15 of the Arizona Constitution because it does not require multiple mitigating factors to be considered cumulatively or require the trial court to make specific findings as to each mitigating factor. *See Apelt,* 176 Ariz. at 368, 861 P.2d at 653.

Arizona's death penalty statute violates the Eighth Amendment because it does not suffi-

ciently channel the sentencer's discretion. *See State v. Roscoe,* 184 Ariz. 484, 501, 910 P.2d 635, 652 (1996).

Arizona's death penalty statute is constitutionally defective because it fails to require the state to prove that death is appropriate. *See Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

The Arizona death penalty statute is unconstitutional because the aggravating factor of cruel, heinous or depraved is vague and fails to perform its necessary narrowing function under the Eighth and Fourteenth Amendments. *See Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

The Arizona statutory scheme for consideration of mitigating evidence is unconstitutional because it limits full consideration of that evidence. *See Spears,* 184 Ariz. at 291, 908 P.2d at 1076.

The prosecutor's discretion to seek the death penalty is unconstitutional because it lacks standards. *See id.*

The death sentence has been applied discriminatorily in Arizona against poor males whose victims have been Caucasian, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and article II, sections 13 and 15 of the Arizona Constitution. *See State v. Stokley,* 182 Ariz. at 516, 898 P.2d at 465.

The trial court improperly considered a presentence report that contained statements from the victim's sister regarding her opinion as to the proper sentence. *See Spears,* 184 Ariz. at 292, 908 P.2d at 1077.

The presentence report contained inaccurate and unreliable hearsay information. *See Gulbrandson,* 184 Ariz. at 66–67, 906 P.2d at 599–600.

Defendant's rights to due process and a fair and reliable capital sentencing proceeding were violated by the joint sentencing hearing on both the capital and noncapital offenses. *See id.*

A proportionality review of defendant's death sentence is constitutionally required. *See id.* at 73, 906 P.2d at 606.

We continue to reject these arguments in this case.

## DISPOSITION

We have conducted an independent review of defendant's aggravating and mitigating circumstances as required by A.R.S. section 13–703.01 and find that the mitigating circumstances cumulatively are not sufficiently substantial to warrant leniency in relation to the aggravating circumstance of cruelty. A.R.S. § 13–703(F)(6). We affirm defendant's convictions and sentences.

ZLAKET, C.J., and MOELLER and MARTONE, JJ., concur.

NOTE: Justice STANLEY G. FELDMAN recused and did not participate in the determination of this matter.